## In re YAMASAKA.

### (District Court, D. Washington, N. D. July 20, 1899.)

ALIENS—DEPORTATION OF PAUPER IMMIGRANTS—AUTHORITY OF MINISTERIAL OFFICERS.

Neither the act of March 3, 1891 (26 Stat. c. 551), nor any prior act of congress, confers authority on ministerial officers of the United States to arrest and deport an immigrant, who has become domiciled in this country, on the ground that he has become a public charge from causes existing prior to his landing. Such person is within the protection of the fifth constitutional amendment, and can only be deprived of his liberty by judicial proceedings, of which the circuit and district courts are by such act given concurrent jurisdiction.

Hearing on a Writ of Habeas Corpus Issued on Petition of T. Yamasaka.

Corwin S. Shank, for petitioner.

Wilson R. Gay, U. S. Atty.

HANFORD, District Judge. The petitioner, a Japanese person, alleges that he is unlawfully imprisoned and deprived of his liberty by Samuel C. Walker, immigrant inspector of the United States, acting under authority of the secretary of the treasury. A writ of habeas corpus having issued as prayed for, the immigrant inspector has made a return thereto, in which he certifies that on or about the 1st day of June, 1899, he made inquiry and collected evidence respecting the petitioner, and from the evidence so gathered, and the admissions of the petitioner, he, the said inspector, did find that the petitioner "had on or about the 15th day of December, 1898, surreptitiously, clandestinely, unlawfully, and without authority, come into the United States of America, and that he, the said petitioner, T. Yamasaka, was a pauper and a person likely to become a public charge, and that one year since the landing of him, the said T. Yamasaka, petitioner herein, had and has not elapsed." And the return further certifies that the inspector, having decided that the petitioner has no right to be within the United States, and is a person subject to be deported, thereafter made a report of the same to the proper immigration officers of the United States of America, and, pending final decision thereon, did take him, the said T. Yamasaka, into custody. And the return further certifies that upon said report the secretary of the treasury issued his warrant of deportation of the petitioner, of which warrant the following is a copy:

"United States of America, Treasury Department.

"Washington, D. C., June 27th, 1899.

"To Samuel C. Walker, United States Immigrant Inspector, Seattle, Washington: Whereas, from proofs submitted to me, I have become satisfied that T. Yamasaka, an alien immigrant who landed in the United States at the port of New Whatcom, Wash., on the 15th day of December, 1898, came into this

country from British Columbia, Canada, contrary to the prohibition of the acts of congress approved February 26, 1885, February 23, 1887, October 19, 1888, and March 3, 1891; and whereas, the period of one year after landing has not elapsed: I, Lyman J. Gage, secretary of the treasury of the United States, by virtue of the power and authority vested in me by the above cited acts of congress do hereby command you to take into custody the said T. Yamasaka, alien immigrant, and return him to the country whence he came, at the expense of the vessel importing him. For so doing, this shall be your sufficient warrant. Witness my hand and seal this 27th day of June, 1899.

"L. J. Gage, [Seal.]

"Secretary of the Treasury."

And the return further certifies that the inspector holds the petitioner for deportation by virtue of the said warrant.

The case made upon the petition and return presents for decision the following question: Do the statutes cited in the warrant confer upon the secretary of the treasury the power assumed,—to arrest and remove from the United States an alien who may be found dwelling in this country, because he is poor, and, in the opinion of the secretary, likely to become a public charge? The provisions of the several acts of congress bearing upon this question are as follows: The act of February 26, 1885 (1 Supp. Rev. St. U. S. [2d Ed.] p. 479), prohibits the importation or immigration into the United States of foreigners who have previously entered into contracts to labor in this country, and prescribes penalties to be recovered from persons, companies, or corporations guilty of bringing in contract laborers contrary to its provisions, and declares that the master of any vessel who shall knowingly bring into and land in the United States any laborer, mechanic, or artisan, who, previous to embarkation on such vessel, had entered into a contract to labor in the United States, shall be guilty of a misdemeanor, and be subject to a fine or imprisonment for such offense. The act of February 23, 1887 (1 Supp. Rev. St. U. S. [2d Ed.] p. 541), provides that the secretary of the treasury shall be charged with the duty of executing the provisions of the act, and confers certain power upon him, and also provides "that all persons included in the prohibition in this act, upon arrival, shall be sent back to the nations to which they belong and from whence they came. * * * The secretary of the treasury shall prescribe regulations for the return of aforesaid persons to the country from whence they came. * * * The expense of such return of aforesaid persons not permitted to land shall be borne by the owners of the vessels in which they came. And any vessel refusing to bear such expense shall not thereafter be permitted to land at or clear from any port of the United States. And such expenses shall be a lien on said vessel." These statutes relate only to the importation and immigration into this country of aliens under contracts to labor in this country, and by no rule of construction can the prohibitory clauses be extended to include other classes of foreigners. The authority given to enforce the return to their own country of aliens whose coming is prohibited is limited so as to apply only to such prohibited persons at the time of their arrival, and the acts do not give authority to deal with aliens who have succeeded in making their way into the United States and who have become inhabitants. A further amendment to these laws is found in the act of October 19, 1888 (1 Supp. Rev. St. U. S. [2d Ed.] p.

633), which provides that the act of 1887 "be, and the same is hereby, so amended as to authorize the secretary of the treasury, in case he shall be satisfied that an immigrant has been allowed to land contrary to the provisions of the law, to cause such immigrant, within the period of one year after landing or entering, to be taken into custody and returned to the country from whence he came, at the expense of the owner of the importing vessel; or, if he entered from an adjoining country, at the expense of the person previously contracting for the services." Obviously, this statute is also limited in its scope so as to relate only to contract laborers, and does not authorize any officer to molest any person found in this country, other than an alien under a contract to labor. The return of the inspector to the writ in this case does not pretend that the petitioner came into the country pursuant to a contract previously made with any person, company, or corporation to labor or render service after his arrival. Therefore no authority can be claimed under the act of 1888 to issue the warrant for his deportation.

The act of March 3, 1891 (1 Supp. Rev. St. U. S. [2d Ed.] p. 934), is entitled "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor;" and it provides that certain classes of aliens, including paupers or persons likely to become a public charge, shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers. The eighth section of the act provides for the inspection of alien immigrants at the time of their arrival, and makes the decision of the inspection officers final, unless appeals be taken to the superintendent of immigration, whose action shall be subject to review by the secretary of the treasury. The tenth, eleventh, and thirteenth sections of the act are as follows:

"Sec. 10. That all aliens who may unlawfully come to the United States, shall, if practicable, be immediately sent back on the vessel by which they were brought in. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessel on which such aliens came. * * *

"Sec. 11. That any alien who shall come into the United States in violation of law may be returned as by law provided, at any time within one year thereafter, at the expense of the person or persons, vessel, transportation company, or corporation bringing such alien into the United States, and if that cannot be done, then at the expense of the United States; and any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing therein, shall be deemed to have come in violation of law and shall be returned as aforesaid."

"Sec. 13. That the circuit and district courts of the United States are hereby invested with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of this act; and this act shall go into effect on the first day of April, eighteen hundred and ninety-one."

As the result of my analysis of this statute, I find that its elements are: First. Prohibition of immigration into the United States of certain specified classes, including paupers or persons likely to become a public charge. Second. To make the prohibition effective, persons and corporations who import or assist aliens of the prohibited classes to come into the United States are subjected to penalties. Third. Officers are provided, charged with the duty and clothed with

authority to inspect aliens upon their arrival, and to prevent the entry into the United States of those who appear to belong to the prohibited classes. These officers are fully empowered to receive and consider evidence, and to decide as to the right of an alien to enter, and their decisions are made conclusive, subject only to review by their superiors up to the head of the treasury department, and all aliens who are by the inspection officers found to have come to the United States unlawfully shall be sent back on the vessel by which they were brought in. Fourth. Aliens belonging to the excluded classes, who have succeeded in making their way into the United States, may at any time within one year after arrival be proceeded against in a lawful manner, and returned to their own country. But the law does not confer power upon ministerial officers to arrest them, or adjudicate any controverted question respecting their freedom to remain in this country, and it does invest the circuit and district courts with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of the act; and I hold that, whenever proceedings affecting the personal liberty of any person who may be found dwelling in the United States shall be instituted pursuant to this law, there must necessarily arise a cause of which the courts have full jurisdiction by virtue of the thirteenth section. In the case of Nishimura Ekiu v. U. S., 142 U. S. 651–664, 12 Sup. Ct. 336, the supreme court affirmed the validity of the provisions of the eighth section of this act of 1891, conferring power upon the secretary of the treasury, and immigration officers acting under his direction, to decide finally all questions as to the right of aliens to enter. And the court held that, as to aliens who have never gained a foothold upon the soil of this country, the inquiry and decision which officers of the executive branch of the government may make in the due course of administration of the immigration laws is due process of law. But I do not think that the decision in that case, or any decision to which my attention has been directed, justifies the assumption of power by ministerial officers of the United States to arrest aliens, and expel them from this country, when such power is not conferred upon such officers in explicit terms by an act of congress. An act of congress should not be construed so as to read into it a provision not necessary to its enforcement, and contrary to the letter of the bill of rights contained in our national constitution. The guaranty of personal liberty in the fifth amendment to the constitution of the United States does not distinguish between citizens and aliens, but lays down the broad principle that no person shall be deprived of life, liberty, or property without due process of law.

For the reasons above stated, I must hold that the detention of the petitioner by the officers of the treasury department is not authorized by any law. The statute providing for returning alien paupers to the countries to which they belong is a wholesome provision, and this court has no disposition to obstruct lawful proceedings thereunder. If it is true that this petitioner has become a public charge, from causes which existed before he came into the country, the government should cause an information to be filed against him in a court having jurisdiction to issue proper process for his deporta-

tion; he should be given the right to defend against proceedings instituted for the purpose of depriving him of his liberty, and then the question of his right to remain in this country should be determined judicially. The policy of our government in this respect is well illustrated in the statutes excluding Chinese laborers. Even a Chinaman cannot be arrested and expelled without a judicial warrant, and a judicial determination of his rights after a hearing. Petitioner discharged.